May it please the court, Richard Ackerman on behalf of Mr. Kowell, and I'd like the court to recognize that Mr. Kowell was present in the courtroom today. What I'd like to do is just simply highlight, I think, which is the biggest overriding issue in this case, is the idea that an investor going into a business that they believe to be legitimate would have to envision that they might be sitting before this court or Judge Rafiti nine, ten years later, after initially investing, continuing to invest, seeing some return, then the thing blows up in 2001 or so, and there's some public attention given to this, knowing that our initial investment and returns were occurring in 97 or 98, and then to think that beyond 2001, 2002, bringing us into 2004 and now 2006 that we're resolving this issue, that we're now nine years later. I think that what the Supreme Court in part was thinking about in a lamp was the idea that we need a uniformity, we need stability in the marketplace when we're talking about how do we handle investors who get into a bad deal that turns out to be a fraud. Does a shareholder in Enron need to think to themselves, well, maybe after this all shakes out, I'm going to have some receiver or I'm going to have somebody come into place and say we're going back as many as seven years under California law, but had I been lucky enough to be in Colorado or some other state where the statute might be one year. Well, don't we have to sharpen it up a little bit? This is not only a securities case, it's a Ponzi scheme case. Yes. So that puts a little different picture on it, a little different patina on the issue, doesn't it? Well, I think so, but it doesn't get rid of the equity issues in the number of... Well, there's equity, but there's also the law. We've got a ton of law with regard to fraudulent transfers, and so what do we do with that? I mean, I understand your equity argument, and there's a lot of equity arguments if you want to look at the bankruptcy. Banks never used to think that they could be subject to a stay order, and now all you can do is file bankruptcy and everybody shuts down. So there's policy and political issues that go in making up these laws. So we're dealing with the bankruptcy code and the fraudulent transfer statute. So what do we do with that? I think that in any legal issue we always look at it against the backdrop of the Constitution, including due process principles. What's unconstitutional about this? There is no way that a reasonable investor in the marketplace could know where his or her potential liability begins given the circumstances of a Ponzi scheme operating across state lines, across 6,000 investors from state to state. It's a fundamental principle of law that when we go into a situation that we know ahead of time. It's true that you may not have seen the speed limit sign, but the law will be imputed to you. But if we're talking about a 10B-5 situation, as was indicated in the two prior Wallenbrock decisions, and we know that we're dealing with something called securities, and Mr. Donnell, on top of that, as was indicated in the record, sends a letter back to Mr. Cowell saying, hey, these were securities, I think that as an investor in a live due process and being able to have reasonable expectations about where my liability begins and ends, have a right to know what I'm going to be hit with. I think you're just arguing that the state fraudulent transfer acts don't apply in this situation. And I don't think they apply. And you're also arguing that the bankruptcy code and any of its policies don't apply in this situation. The bankruptcy code under most of the cases cited by my colleague, Mr. Davidson, actually referred to a one-year transfer prohibition. No, but the cases have tied the bankruptcy code and the fraudulent transfer acts of the states together. In this case, that's what we're dealing with is a fraudulent transfer statute of California, right? That I contend doesn't apply by its very language. Okay. And going into that same issue, and it's a tie-in to, well, where does a reasonable investor know that his liability begins and ends? If we say, well, you've got the Uniform Fraudulent Transfers Act in California, it's going to tell you where you need to be, Mr. Cowell, then one would think that we ought to be able to apply it cleanly, identify our debtor, identify our creditor, and identify our transferee from the debtor. That doesn't cleanly apply here under the law as we cited to it in our brief. It looks like the principal case in this area is not one from our circuit, but is one out of the seven circuits, the Scholes case, which has taken the Uniform Transfer Act and applied it to a Ponzi scheme. What do we do with Scholes? Is Scholes wrong? I think that Scholes, in dealing with the law as it is in the Seventh Circuit, was appropriate to those circumstances. As I remember in Scholes, there was an issue about it was the wife who was conveying various things to churches and things like that afterward and claimed that, well, how was I as the wife supposed to know that my husband was doing this? I think that that's a different situation than what we have here, which is where you have 6,000 people who don't know each other who are suddenly being told that, well, you're each partners to each other. I think the wife was just one part of that, but this was an overall Ponzi scheme. I think she was not part of the Ponzi scheme, but she was not the only one involved here, and I think that we had passive investors involved there as well. That is correct. There were passive investors, and in looking at the Scholes case, which was from 1995, I think that it is important to note that as we dealt with Lampf and the fallout from there and then Congress responding by creating a safe haven of 60 days to file any claims that might have been affected by their dealing with Lampf, then we end up with Sarbanes-Oxley's, which comes along in 2002 or so. So to suggest that in 1995, where they apply this sort of view that, well, we're just going to apply fraudulent transfers because we have broad powers of equity in dealing with investors who might have made money, I don't think neatly fits into the legal. So you're suggesting that Lampf affects Scholes, that Scholes is no longer good law in light of Lampf? I think that there's an argument that the policy reasoning behind it doesn't apply as neatly and cleanly as we might from an investor's perspective being entitled to know. With respect to Sarbanes-Oxley, are you arguing that Sarbanes-Oxley preempts a case such as Scholes? I think that there is a compelling argument. I think we ran with that theme that, yes, there is a good argument for preemption, and public policy would support the idea that we ought to have uniformity in the investments market so that when we've got an investor who's in one state, that he knows that he's not going to get an easier break than the guy in the next state or vice versa, that one guy has to think to himself, well, geez, had I just simply crossed state lines when this all had happened, or had I done a transfer in this other state, I might not be liable. I don't think that that provides for the type of security that somebody taking their retirement money, taking money from a pension, rolling something over into a plan like this, should be left with. That's bad public policy. There has got to be a uniformity that spreads across, and I think Congress, by dealing with securities and saying this is an area that we care about, and then passing the reforms that we saw under Sarbanes-Oxley, which were in place as the Cowell case was moving along, do apply, and that there's a very solid argument that, yes, that's the governing standard if we're going to apply fairness and due process to the situation, and also keeping into account a sort of a strict constructionist view. Counsel, I see that you've raised the preemption question in pages 14 to 18 of your brief. I don't see that you've referred us to any statute. I did make a reference to 10b-5 in the statutory structure that was referenced in the Lampf case, and Lampf specifically dealt with, I believe it was Section 77A, which was then the governing statute of limitations. It is true that there's not a direct argument, and I'm simply trying to clarify the concept as raised. Are you arguing that California's UFTA is preempted by what? By the federal securities law, and it's moving into this area and creating uniformity for investors. Okay, but not an express provision of the – it's not express preemption? This is sort of field preemption? That they have so invaded the field, such as to have completely taken it over and to have created uniformity for all investors who might be covered by this. Including fraudulent transfers. I believe so, and I think the public policy supports my position when we look at the effect that this might have on folks who might have invested in countrywide home mortgages or in some of the other areas. Well, we're not in mortgages. But I think that we are allowed to – We're in a – this is Pierce-Ponzi. We're talking Ponzi, and we're faced with Scholz, as Judge Bybee states. So you would have us reject the Scholz approach, and you would have us accept that the Securities Act preempts any uniform fraudulent transfer statutes in any states and that this would be handled within the confines of the Securities Act. As somebody who's politically conservative, I am unfortunately going to say that I do think that it is sweeping enough as to where it should be a federal issue, and yes, I am arguing that. Because if we get rid of Scholz, we don't have any guidance. I mean, Scholz really kind of – talk about preemption, it kind of preempts the Ponzi field. I don't think that the court's without guidance. I think that even as we look at the Tiger Petroleum case, which was cited in an offensive against me, one of the things that's stated at about page 239 is the court begins to acknowledge, well, how do we deal with the fact that there might not be an equal apportionment of, in that case, a tax issue? Well, somebody got a tax benefit, and what Uncle Sam giveth, he might take it away. But what we're concerned about is uniform application, and I think that that principle cuts both ways when we're talking about uniformly applying a law that's going to put an investor in a bad situation like this. And Lampf is still good law regardless of what Congress did. It's not been expressly overruled by the Supreme Court. Its reasoning in all of its relevant respects with respect to due process, placing an investor on notice of when they might be in trouble, all apply. And it was a split decision, but the majority decision does in fact stand on that core principle that uniformity in the securities market is something that is critical and that we must look at. It provides security for the entire market as well as the individual investor, and that is something that I don't think can be easily overlooked. And then we look at Sarbanes-Oxley as a sweeping reform in terms of dealing with accountability and providing uniformity not only for the bad guy who's running the Ponzi scheme, but uniformity for the investor who might be caught up in a bind like this. And that would be how I view those particular issues. Now with respect to there was, in the big scheme of things, a relatively minor issue, but a critical issue that affects Mr. Cowell as the litigant as to whether or not there were tribal issues of fact. We had raised objections to the declaration of Mr. Biggs with respect to foundation. He was referring to Larry's little black books, and there were a number of references that he made in the declaration. We cited to the fact that if I'm going to be a moving party on a motion for summary judgment, while it is true that under the Celotex standard that the burden would shift over to my client to respond, you first must make your prima facie case by competent evidence, which includes laying a foundation. You don't get to short circuit the rules of evidence simply by filing a declaration in support of a motion. Rather, you must meet all of those requirements just simply on paper. It's a trial on paper. And we raised the issues as to whether or not sufficient foundation was laid as against Mr. Cowell on his specific transactions in the context of a statute of limitations problem and in the context of a dispute about exactly what he owed. And I think that that was a compelling issue. I think that it was an abuse of discretion to overrule my objections to both the declarations of Mr. Davidson and as to Mr. Biggs. And with those points in mind, I will respectfully reserve my seven minutes or so for rebuttal. Okay. Thank you, Mr. Ackerman. Thank you. Mr. Davidson. Good morning, Your Honors. My name is Peter Davidson. I represent James Dinell, the appellee that placed the court. I'll address first the two issues counsel raised. And his first issue was how is someone supposed to know when you invest in something that someone years later may sue you. That argument presupposes that Mr. Cowell is the victim here, and he's really not. He invested $22,000 in an investment that he was told was going to pay him back 20% a quarter guaranteed or 80% a year. He received approximately $73,000 back on his $22,000 investment or $50,000 profit. A profit, which I'll get to later, he admits in answers to interrogatories he paid taxes on. He would have only paid taxes on $50,000 if he made a profit of $50,000. But he made a profit of $50,000. That's a 220% profit that he made. Even after the receiver sued him and was successful because of the statute, which we acknowledge is four years. We can only go after so many payments that he made. He still walked away with $18,000 profit in his pocket. Was this something about too much profit? No, it's just to show he's not the victim. He wanted to know how is someone supposed to know. I think if you're going into something that's promising you 80% a year guaranteed, something may be up. You mean if it happens, it's too much. I think it's a saying, if it sounds too good to be true, it just might be. And here's the situation. I understand that. And it's sort of like urban legend and all kinds of media warnings. But what's the legal basis? Then we go from there. If it's too much, legally blank. Well, his argument was how is anyone supposed to know that I may be sued seven years later if it turns out to be a Ponzi scheme. So how do we translate that into an opinion? Do we say if you're going to get an 80% return, it's too much, be aware, 50% is okay? No, I think there are opinions out there already, including this court's decision in United Energy decided before this investment, that there may be cases out there where if you're in a Ponzi scheme, it turns out, and you got back more money than you put in, you have to return the profit. That's the case law. That's Scholz. We're not just relying on Scholz. We're relying on opinions of this court in United Energy and Agritech. And there's another case, just a bankruptcy case that came out recently. It's Bayou Energy, Bayou Group, LLC, 362 Bankruptcy Porter 624. And I only cite it because the court summarized the law and said, Plaintiffs are correct in asserting in their brief that virtually every court to address the question has held unflinchingly that to the extent investors have received payments in excess of the amounts they invested, those payments are voidable as fraudulent transfers. And it cites Scholz, it cites this court's decision in United Energy. United Energy, if I'm not wrong, I'm just checking here, is a BAP case, so it's a bankruptcy case, right? No, it's a bankruptcy case. It's the Ninth Circuit decision. Yes. 1991. And it talks about the California's fraudulence conveyance statute. Correct. In that case, the court found there wasn't any profit paid to the people, so it wasn't recoverable. Court in footnote six said, however, had they gotten back more than they put in, it would have been recoverable as a fraudulent transfer. That's really what this case is all about. And it's not just this circuit and the receiver in Scholz. There's the Warfield case we cited, Fifth Circuit case, 2006, receiver sued on the same basis and was affirmed. SEC v. CIV, 2005 case we just cited, we cited in the brief, again a receiver suing in a Ponzi scheme to recover fraudulent transfers. Let me ask you a question to clear my mind here. The United Energy case was in 1991. Correct. And there we found that the we analyzed the California fraudulence conveyance statutes with the fraud transfer provisions of the bankruptcy code. And we found that they're similar. Therefore, we analyzed state statutes and the code provisions contemporaneously. So we should follow that now. Correct. And, indeed, if you look at the bankruptcy code, Section 544 allows a bankruptcy trustee to use state law fraudulent transfer actions. And besides, the bankruptcy code's own fraudulent transfer actions. And the reason trustees do that is under the bankruptcy code, it used to be one year. Now it's two years. But under state law, you can go back four years. And so you can, under 544, the bankruptcy code, if it was a bankruptcy case, you'd use the California fraudulent transfer actions. Again, the Audience Council's Lampf and Sarbanes arguments. This really isn't a securities case. This is a fraudulent transfer action. Fraudulent transfer actions, as we point out, have existed in the law since 1571, the Statute of Elizabeth. It's a cause of action that existed for that time, for all that time. And just because the underlying thing that was involved was the security doesn't limit the types of causes of action a receiver or someone else can bring. It's a little disingenuous, Counsel, isn't it, to characterize it as not a securities case in light of our decision in Wallenbrock? I think Wallenbrock, SEC versus Wallenbrock, is a security case. And I think what he invested was in our securities. But this case is not a security case. It's a fraudulent transfer case. It's much like, I can give you two examples. If I contracted with Your Honor to buy 1,000 shares of General Motors from you and you breached, can I not sue you for breach of contract and have a four-year statute? Am I limited to suing you for securities fraud because the underlying thing was a security? That's a little different. That's a little different case. I mean, what they were trying to figure out in Wallenbrock is whether the Ponzi scheme as set up violated the securities laws. And it's an aggressive use of the securities laws in a case like that when they're not selling stock. And the court found the promissory notes were securities. But in the tort context, the same thing. If I'm walking down the street carrying bearer bonds and you rob me a gunpoint, can I sue you for conversion or an assault? According to them, I can only sue you for securities fraud. And the fact is there was no securities fraud here. We've never accused Mr. Cowell of being involved in securities fraud. For a 10 v. 5 claim, he has to have scienter. He has to have misrepresentations. No, but he is a bit of an unwitting participant in a securities fraud. He was a purchaser of securities that someone else was defrauding him or everybody about. But he got back more money than he put in. It seems to be a much closer case than if there's a preemption argument to be had. It seems to be much, much closer than in the case of somebody who's stealing bearer bonds. Right, but he... Anybody would argue that stealing bearer bonds is somehow preempted by securities law. And I don't think it matters what he bought. If your honors had decided that those notes weren't securities, we'd still have a fraudulent conveyance action. It doesn't matter what he purchased. It was a Ponzi scheme. There's no challenge that this was a Ponzi scheme. And the law is clear. In a Ponzi scheme, if you got back more money than you put in, that's recoverable as a fraudulent transfer because it's other people's money. It's almost no different from the situation where if you purchased my car and it was stolen and the real purchaser comes along, you've got to give the car back. That's the law. And that's the situation here. On the evidence issue, on the issue of... And it's sort of like, and I would say, I came across it, and it's your honors, Judge Brunelli's own decision, and Bishop Baldwin, Riewald, Dingingham, and Wong, 819 F. 2nd, 214, which was another Ponzi scheme case, had to do with preferences. But at the end of the case, Your Honor concluded, if decisions such as this in Clearinghouse help us discourage these Ponzi arrangements by encouraging more careful investment activities on the part of the ordinary consumer investor, there will be fewer defrauded creditors to sit at defendant's table in preference suits in the future. He invested in a Ponzi scheme, and the law has said that's the result. If you invest in a Ponzi scheme and you got back more than you put in, it's other people's money. You've got to return it so it can be at least given back partially to the other defrauded investors. We only sought the profit. Still got all this money back, and in this case, even made a profit. On the evidence issue, that same issue was sort of dealt with as well in the Scholes case. In the Scholes case, the appellants argued that the accountant's declaration in the Scholes case wasn't based on personal knowledge, and the Seventh Circuit addressed that as follows. They said, but so what? Irregularities in evidence are material only when material facts are disputable and disputed. Otherwise, they are harmless error and can be ignored, and that's what happened here. The material facts of the investments, the amounts he put in, the amounts he got back, and most importantly, though, the profit that he made weren't disputed. Mr. Cowell, as we pointed out in answer to interrogatory number seven, admitted he paid taxes on $50,000. Mr. Cowell, in opposition to the summary judgment motion, didn't raise in his statement of genuine issues any challenge to the assertions in the receiver's statement of facts that the amount of the investment, the amount he got back, the profit that he made, we attached to the receiver's accountants, Mr. Biggs' declaration were the checks and a summary of the checks. And in fact, Mr. Cowell, in opposing the summary judgment motion, relied on, and actually even introduced those exhibits attached to Mr. Biggs' declaration as part of his statement of genuine issues. If you look at his statement of genuine issues number four, where he's making an argument about the statute, the only proof he attaches sites to is exhibits C and D to Mr. Biggs' declaration. So he adopted what were the material facts, which were the amount of the investment, the amount he got back, and the profit. That's why that oral argument before Judge Rafiti, which Judge Rafiti pointed all that out to counsel, he asked, what are we going to try? There's really no dispute about the amounts involved, and there's nowhere in the record where that's disputed. Mr. Cowell, in his declaration, doesn't say the numbers are wrong, those aren't the checks, I didn't make a profit. He says just the opposite, I made a $50,000 profit. And we didn't even seek the whole $50,000, because we were limited. So I think the evidentiary argument is not appropriate. I think that really... Would you address the tax question, please? The tax question? Yeah, the question of offset for taxes. Let me start with this question. Is there anything in the record that indicates as to whether the IRS, whether he can file an amended return for those years and get the IRS to return the money? There's nothing in the record that says that at all. Okay. So let's assume, then, that the IRS is not going to return the money. In that case, then, tell me about the offset. Why hasn't he overpaid the government on something that he no longer has? I don't know that he can't amend. There's just nothing in the record about it. If we go back on the tax question, would you then conduct that inquiry as to whether the IRS was capable of going back and amending the return? I don't think he's entitled to an offset for taxes for a couple of reasons. First, we cited the one case that that was addressed, and the court said, well, if that's the case, the recovery from everybody is going to be different because everybody's got a different tax situation. You may be able to deduct it. You may not. Why does that affect how much the receiver or the plaintiff can recover in a fraudulent transfer action? More importantly, however, there's decisions from this court that you can't have set-offs in fraudulent transfer actions. I think it's cited. I know it was cited below. Let's see if I can find it here. But there's two decisions by this court saying fraudulent transfer actions, you're not entitled to an offset. And one of the reasons is, I think, is you're talking about whole dollars and partial dollars. In many cases, in a receivership, for example, if you're going to offset some other type of investment, you might be offsetting something where you'd only get 10 cents on the dollar back, but you want to treat it as whole dollars, especially in the bankruptcy context. What does that netting doctrine have to do with this? And the netting doctrine, it seemed to me, that applies to fraudulent transfers and Ponzi schemes, that they look at what you put in and then what you received and net it out. Now, nowhere in that netting process does it talk about set-offs, offsets. No, it doesn't. Is the offset more of a damage against the tortfeasor? In other words, if I invest with someone and they tortiously take my money, fraudulently take it away from me, and I want to sue them, part of my damage is that I lost my money and the taxes went up and all that stuff. Is that part of it? Well, it's part of it, but I think it's more that it's different in different situations. For example, sometimes you see people saying, well, I should get interest on my money. I wasn't able to use it for that period, and therefore I should get an offset for the lost use of the money, which is something I think Mr. Cowell said. And the courts have generally denied that because then it would depend when you invest it and how much interest. Everybody would be completely different. And that kind of goes to the merits. In other words, you're not standing in the shoes of the fraudulent scheme operator. No. And so the question would be, if you were, you could have defenses against you, I guess like joint tortfeasor or something like that. But it seems to me you're coming in fairly clean. And what you're saying is you have a right of restitution and rescission, so I'll give you your money back depending on how it fits into this Ponzi scheme, which is this netting effect. Right. Because if you get down to trying to get to the equities of the set-offs, then you're way down the line. You either kill it before you start or else we'll be arguing about what the value of each set-off is. That's correct. That's correct. And I think that's what the cases have generally held, this court's cases have held. I'm just inquiring because if you want to get below the fact that set-offs are inappropriate, then you start arguing the merits of each set-off. Right. And it's going to be different for each person depending upon their different tax situations when I invested. And it's really, if you start talking interest, the reason the courts have denied interest on these types of claims is because then you're really penalizing more, the people that got in later than the people that got in before, and you're sort of perpetuating the Ponzi scheme. You got in earlier, so we're going to give you interest on it to the penalty of people that got in later and not. I think that kind of goes back, too, to the labeling argument counsel is making about who is suing what capacity and who's that person. Right. And this court has already ruled, I think, in, I'll find it here, that the receiver doesn't just step into the, completely step into the shoes of the fraud. The receiver, I think in this court's language, is thrust into the shoes when a receiver is appointed or a bankruptcy trustee is appointed, and his situation is different. He's not bound by the baggage that that person has, that the defrauder has. He's put in there for a different purpose, and he comes away not stuck within peri delicto. So I think that's why the receiver's in a different position. Thank you, counsel. Mr. Ackerman? Thank you. With respect to the first comment that was made about, well, geez, this isn't really a victim, I think that what we do is we apply a little bit of common sense here, and we say, well, geez, how did this happen? We go to the excerpts of the record at page 247, and we see two guys working for Aerojet, a defense contractor, happen to be doing business with each other on the, you know, the, hey, I've got an opportunity for you. He knows him. He's worked with him. Bill Wong's a guy who's got the same security clearance he's got. It's not that he's thinking to himself, oh, geez, I'm going to be able to pull a fast one here, and I'm going to be part of a Ponzi scheme. It's no different than had my life insurance guy, who happens to sell security as well, comes, hey, Rich, I think here's a hot stock. Why don't you look into it? It's that simple. I think a lot of times in the law we tend to overlook how things happen just as a matter of common sense. What happens in the workplace is did here. He relies on the fellow employee. The fellow employee says I'm making money, and he believes it. He sees the money and says, well, yeah, I'd like to be a part of that. And then he pays the taxes on the $50,000. He made the money in the first part of it, and that's part of the reason that we're left with pursuing $26,000 instead of some larger number, because he did pay the taxes. And if I'm not mistaken, the time to amend a return is typically four years from the time that it was filed. Now, I don't want to be quoted on that. I had this issue come up recently, but there is a definitive time. So to the extent that there is an actual loss, then when we look at a fraudulent transfer, one of the big questions, and this came up in United Energy, was, well, what constitutes full consideration for the transfer? Now, going back to law school, contracts one, we say, well, what's consideration? Doing something that you didn't have to do before, and how do we measure that consideration? Well, it may include tax consequences, doing something you didn't have to do with taxes. That sounds like damages to me, and aren't we in a rescission mode here instead, in a rescission mode within the Ponzi scheme? And that's why early on I asked you about the Sholes case. It seems to me the Sholes case has wandered into areas that maybe we have a few gaps in our circuit. So you're opening up areas that we're going to have to decide in this case that probably aren't really covered. I don't think we've addressed this offset issue anyway, have we? No, and the offset issue got slightly approached in they sort of touched on it in the Tiger Petroleum case. In the United Energy case, they touched on it a little bit because they get into culpability. There's a discussion about what the BAP did with, well, was anybody really at fault? Should we look at that? It was a one-year transfer statute that they were applying in that particular context, and they did look at, well, how is this set up? Do we need to take these things into consideration? We are sitting in equity, so we need to be fair here. And the things that I'm asking for aren't out of line with the equity considerations that other courts have expressed. And there's sort of a big glitch in the whole argument about, well, those really amount to damages. You need to go after the bad guy. Practically what's happened now is that the receiver, in terms of operating the business, has stepped in the shoes of the tortfeasor. That's an interesting point. Is he really operating the business in the scheme that's been established in our cases? In other words, when you get a Ponzi scheme, he's not running the Ponzi scheme anymore, is he? No, but the issue becomes is he's holding all of the assets for which one might be able to collect a judgment on a standard fraud cause of action against the former perpetrator. Or rescission. Or under rescission, if it's a restitutionary theory, or if it's a clean-up damages issue in equity where we say, well, we've got an equitable clean-up, hey, you had to pay these taxes, here's the other consequential damages that you have interest on a credit card that you pulled on to get the money. Well, that's the point. Is this in the nature of damages and consequential elements of damage, or is it pure rescission so that the receiver can spread whatever he finds back against all the Ponzi scheme investors? No, it sounds to me, because ultimately it's not the receiver's decision to do equity. It's the court's decision. And I think that there's a tribal issue that gets created as to, all right, I'm a court. This guy's been hailed into federal court to answer to charges that he was part of a transfer. He's claiming that the transfer was not fair to him because he lost all of this in part of the process. It's not all the profits you think it is. And if we're sitting in equity, you're not going to have a jury trial. It's going to be probably a one-day bench trial on what are your particular offsets. And I don't think that in light of due process, in light of the fact that you can't go back and fix some of the damages that you've been caused, even if you made some money, and the receiver sets up a claims process, you're not allowed to sue. Anybody's standing in the shoes of the former tortfeasor. And your tortfeasor's now sitting in jail, so any assets that you might be able to get at as a vigilant litigant who's trying to protect his rights, you're out. There's nothing you can do. And that's exactly the situation that Mr. Cowell's in. It's not like he can go sue Mr. Osaki or Mr. Itsunobu or any of the fine folks that were involved in this thing. Are his losses cognizable? Are they material? Were they a consequence of having done business with these folks? Absolutely. And it's not enough to say, well, he wasn't really a victim because, well, he invested in this. And it's in the record in this case that his mother was an investor in this as well and took retirement monies and put it into this whole scheme. And to say, well, geez, she's not really a victim because she might have made a little bit of money, if that money was spent on home improvements, getting out of debt, improving the quality of life, the next thing you know, you're being hailed into federal court. Years later, after the initial transaction, there is a fundamental fairness issue. And while Judge Rafiti, I think, told me, quote, unquote, that he didn't care about fairness in the record, I do think that the law requires that we look at fairness and that we look at the totality of the circumstances, knowing that as we deal with a fraudulent transfer in a Ponzi scheme, equitable considerations don't get left at the doorsteps of the court. It's something that we do have to look at. The United Energy case suggests that. Tiger Petroleum suggests that. And at least one other case that was referenced in Appellee's brief suggests that the court does look at the totality of the circumstances. And I don't think that the court can just ignore the fact that Congress has been wise enough to do sweeping reforms to create the uniformity that one would expect in a case like this where you've invested your money, your life savings, in what you believe to be a legitimate investment plan. And with my 22 seconds, I will respectfully submit unless there's further questions. Thank you. Thank you, counsel. We thank both counsel for the argument. The court stands in recess. Thank you.
judges: Brunetti, Bybee, Bowman